UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| YVONNE ERVIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:08-cv-0970-DFH-DML |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Yvonne Ervin seeks judicial review of a final decision by the Commissioner of Social Security denying her application for supplemental security income benefits. Acting for the Commissioner, Administrative Law Judge ("ALJ") Albert J. Velasquez determined that Ms. Ervin was not disabled under the Social Security Act because, in spite of a serious heart valve problem, she retained the residual functional capacity to perform light unskilled work. Ms. Ervin contends that the ALJ erred by failing to articulate adequately his assessment of her residual functional capacity and credibility, by ignoring a line of evidence supporting a finding of disability, and by failing to obtain an updated medical expert opinion regarding medical equivalence to a listing. The court finds the ALJ failed to explain adequately his finding regarding Ms. Ervin's residual functional capacity and credibility. The ALJ's decision must be remanded for further consideration.

I.   *Medical Record*

Ms. Ervin claims to have become disabled on March 29, 2004.  R. 331A-32. Her full medical history is provided here for background.  Ms. Ervin was examined by Dr. Patrick Bourdillon, a cardiologist and professor of medicine at Indiana University, in March 1999.  R. 146.  Dr. Bourdillon opined that Ms. Ervin had moderate to severe mitral stenosis and was suitable for balloon valvuloplasty because she was symptomatic – she was complaining of worsening breathlessness.  He performed the balloon valvuloplasty on April 7, 1999.[1]  The procedure was successful but was complicated by an increase in Ms. Ervin's mitral regurgitation from mild to mild to moderate.  R. 148-49.

Dr. Bourdillon examined Ms. Ervin again on April 20, 1999.  R. 144.  Her right leg had become very swollen the week before, consistent with deep venous thrombosis.  By June 1999, Ms. Ervin's deep vein thrombosis had resolved, but she still had some slight swelling and edema and remained breathless on minor exertion.  R. 142.  A month later, Dr. Bourdillon noted that Ms. Ervin reported that she was much improved since the valvuloplasty, although she became breathless when she performed a lot of housework or ran.  R. 140.  She reported that she was unable to walk up a flight of steps without significant

---

[1] A valvuloplasty is a procedure in which a catheter is inserted into a heart valve and a balloon is inflated to open the valve.  The balloon is then deflated and the catheter is removed.

-2-

breathlessness. *Id.* Dr. Bourdillon surmised that Ms. Ervin's continued breathlessness was partly due to residual pulmonary hypertension. *Id.*

From September 1999 to October 2001, Ms. Ervin visited Wishard Memorial Hospital for periodic appointments for her heart condition. R. 156-57, 172-83, 185, 213, 215-16. On several of these visits she presented with dyspnea on exertion or shortness of breath and rare palpitation. R. 173-74, 177-79, 185. On two occasions, Ms. Ervin reported smoking a pack of cigarettes a day. R. 179, 185.

When he examined Ms. Ervin on October 9, 2001, Dr. Bourdillon opined that she continued to have pulmonary hypertension, mild to moderate mitral regurgitation, and moderate mitral stenosis. R. 134. Ms. Ervin reported that her breathlessness had become worse since she resumed smoking. R. 134. After she quit smoking, Dr. Bourdillon noted that from a cardiac point of view, she seemed to be better. R. 133. Ms. Ervin continued to treat with Dr. Bourdillon from November 2001 to March 2004, who during this time observed holosystolic murmurs with mitral regurgitation, diastolic murmurs with mitral stenosis, and sounds consistent with pulmonary hypertension. R. 124-33. On June 25, 2002, Dr. Bourdillon discussed the possibility of mitral valve surgery, but Ms. Ervin stated that she did not feel that her symptoms were severe enough to warrant the procedure. R. 130. In March 2003, Ms. Ervin reported that she was "doing quite well" but was still breathless. R. 128. After her October 9, 2003 visit, Dr.

Bourdillon reported that Ms. Ervin was "doing quite well with her residual stenosis and regurgitation, and symptomatically appear[ed] to be holding her own." R. 125. He believed she did not need further investigation or intervention to her mitral valve. R. 126.

On April 6, 2004, Ms. Ervin's heart rhythm was monitored for nearly 24 hours. The report was predominantly normal (sinus rhythm) with occasional premature ventricular contraction, three episodes of atrial tachycardia, and rare premature atrial contraction. R. 109-10.

Dr. Joseph Croffie, a state agency physician, examined Ms. Ervin and prepared a report dated June 17, 2004. Dr. Croffie noted that Ms. Ervin had a history of mitral stenosis, mitral regurgitation, and pulmonary hypertension. R. 121. Dr. Croffie observed that in spite of Ms. Ervin's statements that she became out of breath easily, had dizzy spells, and had to walk very slowly to prevent getting out of breath, she was in no acute distress and had normal breath sounds with good air exchange. R. 120. She did not wheeze or use accessory muscles for respiration. She had a slightly distended jugular vein and a murmur and opening flap sound in her heart, but a normal pulse, and no evidence of arterial insufficiency. R. 121.

At Ms. Ervin's June 22, 2004 appointment with Dr. Bourdillon, he reported that Ms. Ervin seemed "to be doing quite well from a cardiac point of view" and

"had no further dizziness recently." R. 102. Ms. Ervin's chest was clear, her jugular venous pressure was normal, and she had no edema. R. 102. Ms. Ervin's EKG showed a sinus rhythm and nonspecific ST-T wave abnormality. R. 102, 104.

On July 6, 2004, Dr. W. Bastnagel, a state agency physician, reviewed Ms. Ervin's medical records and prepared a report. R. 112-119. He opined that Ms. Ervin could occasionally lift twenty pounds, frequently lift ten pounds, and could stand, walk, or sit for six hours in an eight hour work day. R. 113. Dr. Bastnagel also opined that Ms. Ervin was unlimited in her ability to push and pull with her extremities and could occasionally climb ramps, stairs, ladders, ropes, and scaffolds and could occasionally balance, stoop, kneel, crouch, and crawl. R. 113-14. Finally, Dr. Bastnagel noted that Ms. Ervin had no manipulative, visual, communicative, or environmental restrictions. R. 115-16. Dr. R. Wenzler reviewed the evidence and concurred with Dr. Bastnagel's assessment. R. 119.

On September 21, 2004, Dr. Bourdillon reported that Ms. Ervin had been doing quite well without any further deterioration in symptoms except for one episode of chest pain with some arm numbness. R. 101. He opined that the incident was not cardiac related. R. 101. He again reported that Ms. Ervin had a holosystolic murmur of mitral regurgitation, a diastolic murmur of mitral stenosis, and a soft opening snap, which was "accentuated by sit ups on the

couch with an associated increase in heart rate." R. 101. An ECG performed that day was normal. R. 103.

Dr. Bourdillon prepared a report for the state Medicaid agency concerning Ms. Ervin's physical capabilities dated May 2, 2005. R. 240-46. He stated that he had treated Ms. Ervin for six years and that she had mitral stenosis, mitral regurgitation, and pulmonary hypertension. R. 244. Dr. Bourdillon opined that Ms. Ervin's condition would prevent her from engaging in any type of gainful employment and would not improve with treatment. R. 245. He opined that Ms. Ervin could carry out normal activities and could drive and care for her personal needs, but that she had significant limitations in sitting, standing, walking, lifting, pushing and pulling, bending, squatting, crawling, climbing, reaching, and being around machinery. R. 246. He opined that she was moderately limited in performing normal housework and in exposure to extremes in temperature, dust, fumes, or gases. R. 246.

In June 2005, Ms. Ervin reported feeling much better and that she was "getting about reasonably well." R. 256. On October 11, 2005, Dr. Bourdillon observed that Ms. Ervin had been doing quite well and that there was no change in her mitral valve disease. R. 255. A few months later, on December 13, 2005, Dr. Bourdillon stated that there was some question as to whether Ms. Ervin was becoming more symptomatic and that she had become breathless while walking through the snow. R 253. He opined that overall she had a reasonably good

exercise tolerance, although it was not as good as it was a few years previously. R. 253.  Ms. Ervin explained that she felt able to "do what she needs to do" and did not want to pursue further therapy, such as surgery.  R. 253.  Dr. Bourdillon opined that Ms. Ervin had significant mitral valve disease but that she appeared to be holding her own and that additional treatment was not necessary.  R. 253.

Dr. Bourdillon examined Ms. Ervin three times between March 2006 and September 2006.  R. 247-52.  He reported that she was able to "hold her own" symptomatically, seemed well enough, and "could do what she needed to do."  R. 248-49.  He continued to recommend against further intervention.  R. 247.

On December 14, 2006, Dr. Bourdillon wrote a letter in which he stated that Ms. Ervin had severe mitral valve disease with mitral stenosis and mitral regurgitation.  R. 329.  He reported that Ms. Ervin continued to deteriorate gradually in terms of her symptoms and was significantly limited in activities by her condition and by breathlessness, but that it had not become severe enough to warrant valve replacement.  R. 329.  Professor Bourdillon wrote that the letter was "written to support [Ms. Ervin's] application for disability which she should clearly have."  R. 329.

II.     *Testimony at the Hearing*

Ms. Ervin testified before the ALJ on January 19, 2007. Ms. Ervin testified that she had a tenth grade education. Beginning at the age of 17 she had worked in a restaurant, as a nurses' aide, a babysitter, and a housekeeper. R. 332-332A.

She claimed to have become disabled as of March 29, 2004. R. 331. At the time of her testimony, she was taking Warfarin, Diltiazem, Furosemide, and potassium. R. 333A. She was prevented from working because she got too tired and out of breath, because her heart would start beating very fast, and because she had swelling in her legs and ankles. R. 333A. Sometimes she had chest pains and pain in the middle of her back. R. 334. She testified that her condition had worsened in the past couple of years. R. 334. Any activity would make her breathless. R. 334A. She testified that she did not do her own grocery shopping, and she did not clean and change her own bed linens or participate in church social groups. R. 335. Once every few months her sister-in-law would pick her up and drive her to church. R. 335A. The record of the hearing does not reflect that a vocational expert was present.[2]

III.     *Framework for Determining Disability and the Standard of Review*

---

[2] The ALJ stated in his opinion that a vocational expert, Thomas Roundtree, was present at the hearing. R. 17. According to the record of the hearing, the ALJ's statement was incorrect. Ms. Ervin does not raise any argument related to the absence of a vocational expert, though she does point out the ALJ's misstatement in her brief. Pl. Br. 2.

To be eligible for the supplemental security income she seeks, Ms. Ervin must establish that she suffered from a disability within the meaning of the Social Security Act. To prove disability under the Act, the claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Ms. Ervin was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her in her immediate area, or whether she would be hired if she applied for work. 42 U.S.C. § 1382c(a)(3)(B).

This standard is a stringent one. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Ms. Ervin was disabled under the Social Security Act, the ALJ followed the familiar five-step analysis set forth in the regulations. The steps are as follows:

(1) Has the claimant engaged in substantial gainful activity? If so, she was not disabled.

(2) If not, did the claimant have an impairment or combination of impairments that are severe? If not, she was not disabled.

(3) If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If so, the claimant was disabled.

(4) If not, could the claimant do her past relevant work? If so, she was not disabled.

(5) If not, could the claimant perform other work given her residual functional capacity, age, education, and experience? If so, then she was not disabled. If not, she was disabled.

See generally 20 C.F.R. § 416.920. When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

The ALJ found that Ms. Ervin satisfied step one. She had not engaged in any substantial gainful activity at any relevant time. At step two, the ALJ found that Ms. Ervin had the following severe impairments: pulmonary hypertension and status post valvuloplasty. The ALJ found that this impairment did not meet or equal any of the listings that would have automatically qualified Ms. Ervin for benefits at step three. At step four, the ALJ determined that Ms. Ervin had no past relevant work.

At step five, the ALJ determined that Ms. Ervin retained the residual functional capacity to perform light unskilled work. Based on the residual functional capacity for the full range of light work, and considering Ms. Ervin's age, education, and work experience, the ALJ found that a finding of "not disabled" was directed by the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2, R. 202.17. The ALJ therefore denied benefits.

The Social Security Act provides for judicial review of the Commissioner's denial of benefits. 42 U.S.C. § 1383(c)(3). Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court. 42 U.S.C. § 1383(c)(3); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering

the facts or the credibility of the witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ must articulate at some minimal level his analysis of the evidence so that the court can trace adequately the path of the ALJ's reasoning. *Diaz*, 55 F.3d at 307-08.

IV.  *Residual Functional Capacity*

Ms. Ervin argues that it was improper for the ALJ to equate Dr. Bourdillon's statements that she was able to "hold her own" and do "whatever she needs to do" with an ability to perform light work, discounting available objective evidence related to the severity of her disease.  On this record, the court agrees.

The ALJ considered but discounted Dr. Bourdillon's opinion that Ms. Ervin was unable to participate in gainful employment.  Ultimately, the ALJ is charged with making the determination of disability.  See 20 C.F.R. § 416.927(e)(1).  Here, however, Professor Bourdillon did more than opine generally that Ms. Ervin was disabled.  Based on his years of observation of Ms. Ervin's condition as her treating specialist, he noted that she had significant limitations in sitting, standing, walking, lifting, pushing, pulling, bending, squatting, crawling, climbing, reaching above her shoulders, and being around machinery.  R. 246.  As a treating physician, more weight should have been given to Professor Bourdillon's opinion, unless that opinion was otherwise unsupportable based on objective evidence in the record.  20 C.F.R. § 416.927(d)(2).

The record shows that Ms. Ervin suffered from significant mitral valve disease.  The record also shows that, in spite of her condition, Dr. Bourdillon believed that Ms. Ervin was capable of "holding her own" and was "doing well." Professor Bourdillon's statements must be understood in the context of serious

cardiac disease. Light work is defined by the regulations as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). This category of employment includes jobs that "require[ ] a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* And, for a finding of light work, the claimant must be able to perform these actions eight hours a day over a five day work week. This record shows that Ms. Ervin was barely maintaining independent living, and her treating physician believed she was "significantly limited" in each of the areas required for a finding of light work. Dr. Bourdillon's general comments that Ms. Ervin was "doing well" in terms of maintaining independent living and not needing further surgery or catheterization were insignificant compared to his specific findings as her treating physician that she was significantly limited in most areas required to support a finding of a residual functional capacity of light work. The ALJ's reliance on Dr. Bourdillon's general comments was misplaced. The ALJ's decision must be remanded on this ground for further consideration and explanation.

V.   *Credibility*

Ms. Ervin also argues that the ALJ wrongfully discounted her testimony that she was unable to shower, cook, dust, do laundry, shop for groceries, or do yard work. Pl. Br. 6-8.[3] The ALJ is required to consider statements of the claimant's

---

[3]Contrary to Ms. Ervin's assertion, the ALJ did not "acknowledge[ ] that Ms.
(continued...)

symptoms and how they affect her daily life and ability to work. 20 C.F.R. § 416.929(a). However, neither the ALJ nor this court is "required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work." *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996); accord, 20 C.F.R. § 416.929(d).

Instead, there is a two-part test for determining whether a claimant's complaints contribute to a finding of disability. First, the claimant must provide objective medical evidence of an impairment or combination of impairments that could be expected to produce the symptoms the claimant alleges. 20 C.F.R. § 416.929(a)-(b). Second, the ALJ must consider the intensity and persistence of the alleged symptoms. The ALJ considers the claimant's subjective complaints in light of the relevant objective medical evidence, as well as any other evidence of the following factors:

(1)   The claimant's daily activities;

(2)   Location, duration, frequency, and intensity of pain or other symptoms;

(3)   Precipitating and aggravating factors;

(4)   Type, dosage, effectiveness, and side effects of any medication;

---

³(...continued)
Ervin is *unable* to shower, cook, dust, do laundry, shop for groceries, or do yard work due to shortness of breath and an increased heart rate." Pl. Br. 6 (emphasis in original); see also *id.* at 7. The ALJ merely acknowledged that Ms. Ervin *alleged* that she was unable to do those things. R. 21.

-15-

   (5)  Treatment, other than medication, for relief of pain or other symptoms;

   (6)  Other measures taken to relieve pain or other symptoms;

   (7)  Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

  The ALJ considers these factors in order to make a reasoned credibility determination based upon the evidence about whether the claimant acts, day in and day out, like a person would act who is really suffering from the symptoms the claimant alleges. It is not necessary for the ALJ to recite findings on each factor, but the ALJ must give reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed. See SSR 96-7p, 1996 WL 374186 (July 2, 1996); see also *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) (ALJ must comply with SSR 96-7p in making a credibility determination by articulating the reasons behind the determination). The court will not set aside an ALJ's credibility determination if there is some support in the record unless it is "patently wrong." *Luna*, 22 F.3d at 690; *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

  Here, the ALJ found Ms. Ervin's statements that she was unable to unable to shower, cook, dust, do laundry, shop for groceries, or do yard work inconsistent with Dr. Bourdillon's assessment that her condition was stable and

-16-

that she was able to perform activities necessary to be independent. R. 22. As previously noted, however, the objective evidence in the record supports Ms. Ervin's testimony that she was significantly limited in her activities of daily living. In light of the Professor Bourdillon's findings on her significant restrictions for nearly all work-related activities, his comments to the effect that Ms. Ervin was "holding her own" symptomatically, seemed well enough, and "could do what she needed to do," R. 248-49, seem to indicate only that Ms. Ervin was capable of the minimal level of activity necessary to maintain independent living. Without additional explanation, Dr. Bourdillon's comments do not support the ALJ's ultimate finding that Ms. Ervin was capable of maintaining full time employment performing light work, which can still be quite demanding physically. On this record, remand is required.

For the foregoing reasons, the court finds that the ALJ failed to adequately support his decision denying benefits. The decision is remanded for further proceedings consistent with this opinion. Final judgment shall be entered.

So ordered.

Date: August 27, 2009

*David F. Hamilton*

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Charles D. Hankey
charleshankey@hankeylawoffice.com, kew@hankeylaw.com

Tom Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov, wadlington@usdoj.gov, lin.montigney@usdoj.gov